# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

DANIEL ILIAS,

    Plaintiff,

v.                                            Case No. 8:20-cv-834-WFJ-TGW

USAA GENERAL INDEMNITY CO.,

    Defendant.

_____/

## **ORDER GRANTING SUMMARY JUDGMENT**

Plaintiff Daniel Ilias was badly injured in a multi-vehicle automobile crash. The driver at fault for the accident was insured by Defendant USAA General Indemnity Company. Ilias sued the driver for his injuries and obtained a judgment for $5,230,559.44. Ilias then brought this third-party bad-faith action against USAA, who had insured the driver for $10,000. Ilias sued USAA for its purported bad faith in failing promptly to settle Ilias's personal injury claim against its insured. (Dkt. 1). USAA now moves for summary judgment. (Dkt. 27). The motion is fully briefed. (Dkts. 41; 44). After considering the parties' submissions, the record, the applicable law, and with the benefit of oral argument, the Court concludes that no reasonable jury could find that USAA acted in bad faith or

caused the excess judgment against its insured. USAA's motion is therefore granted, and judgment will be entered in its favor.

## I. THE FACTUAL RECORD

### A. The Accident

On July 29, 2017, USAA's insured, Scott Dunbar, was driving on a divided highway in Pasco County, Florida. Dunbar, traveling in the outside southbound lane of the highway, lost control of his van and struck an SUV traveling in the center southbound lane. After hitting the SUV, Dunbar's van veered toward the median, went airborne over the median, and landed directly on top of the front end of Ilias's Honda Pilot traveling in the northbound lanes. Dkt. 31-2. As a result of the crash, Ilias suffered a torn aorta and broke several bones. Ilias was airlifted from the crash site to the hospital and placed in the intensive care unit (ICU), where he remained for 10 days before spending another three weeks in the hospital and a rehab facility.[1] Dkt. 31-9 at 25; Dkt. 31-16 at 14; Dkt. 35 at 14. Others in the wreck were injured also. *See* Dkt. 31-4 at 2; Dkt. 35 at 28.

---

[1] During his time in the ICU, Ilias was placed in a medically induced coma. As he put it, he was "fighting for his life" because doctors had given him a one-percent chance to survive. Dkt. 31-16 at 16.

## B. The Claims Process and Failure to Reach a Settlement

At the time of the accident, Dunbar was insured under an auto policy with USAA. The policy carried a bodily injury limit of $10,000 per person and $20,000 per accident. Dkt. 31-7 at 5.

USAA learned of the accident the day it occurred when the owner of the SUV filed a claim of loss. Dkt. 35 at 1. Two days later, USAA assigned adjuster Jonathan Del Valle to handle the claim. Del Valle immediately tried to contact Dunbar and the other drivers involved in the accident. Del Valle also requested a copy of the police report, scheduled an inspection of Dunbar's vehicle, and sent Dunbar an "excess letter" explaining that his potential liability for the damages stemming from the accident could exceed his policy's coverage limit. Dkt. 35 at 2–4; Dkt. 42-4. The letter also directed Dunbar to inform USAA if he had an umbrella policy or another liability policy that might provide coverage for possible claims. *Id.* After speaking with Dunbar and confirming he was injured in the crash, Del Valle elevated the claim to an injury adjuster. Dkt. 35 at 10.

Personal injury protection (PIP) adjuster Lindsey Blando took over the claim on August 4th. *Id.* at 8–9. Blando continued to investigate to determine who was at fault for the accident. Dkt. 31-5 at 17. During her investigation, Blando was contacted by an attorney representing Ilias. The attorney informed Blando that Ilias had suffered significant injuries, including a torn aorta and multiple broken bones.

3

Dkt. 31-5 at 34–35; Dkt. 35 at 14. Blando also learned that Luz Brignoni, the driver of the SUV Dunbar first collided with, injured her neck and back in the accident. Dkt. 31-5; Dkt. 35 at 13–14. Because Ilias's injuries were severe and there were multiple injured parties, Blando escalated the claim to John Raymond, a more senior claims adjustor. Dkt. 31-5 at 38.

On August 10th, Ilias fired his attorney and hired Maryanne Furman to represent him. Dkt. 42-5. Upon taking the case, Furman visited Ilias in the hospital. After observing his condition, Furman noted that his damages were "pretty significant" and believed they exceeded Dunbar's $10,000 policy limit. Dkt. 31-3 at 35.

The next day, Furman faxed a letter to Raymond informing him that she was now representing Ilias and that the previous attorney's representation had been terminated. Dkt. 31-6. The letter also requested that USAA provide within 30 days in accordance with Fla. Stat. § 627.4137[2] a sworn statement signed by a corporate officer, or USAA's claims manager or superintendent, setting forth:

---

[2] Fla. Stat. § 627.4137 provides:

> (1) Each insurer which does or may provide liability insurance coverage to pay all or a portion of any claim which might be made shall provide, within 30 days of the written request of the claimant, a statement, under oath, of a corporate officer or the insurer's claims manager or superintendent setting forth the following information with regard to each known policy of insurance, including excess or umbrella insurance:
>
> (a) The name of the insurer.

4

a. The name of the insurer.
b. The name of each insured.
c. The limits of the liability coverage.
d. A statement of any policy or coverage defense which you reasonably believe is available to you.
e. A certified copy of the policy.
f. The name and coverage of any other known insurer.

Dkt. 31-6.

That same day, Raymond faxed a letter to Furman acknowledging her representation. Dkt. 31-8. Raymond attached to the letter a declarations page confirming Dunbar's coverage and policy limits. *Id.* The letter also assured that Furman would receive a certified copy of the policy under separate cover, which Furman received a few days later. *Id.*; Dkt. 31-7.

On August 14th, Raymond received a copy of the police report. Dkt. 31-9 at 17; Dkt. 35 at 18. The report stated that Dunbar was solely at fault for the accident. Dkt. 31-2. The report also stated that Ilias had suffered "incapacitating" injuries.

---

(b) The name of each insured.
(c) The limits of the liability coverage.
(d) A statement of any policy or coverage defense which such insurer reasonably believes is available to such insurer at the time of filing such statement.
(e) A copy of the policy.

In addition, the insured, or her or his insurance agent, upon written request of the claimant or the claimant's attorney, shall disclose the name and coverage of each known insurer to the claimant and shall forward such request for information as required by this subsection to all affected insurers. The insurer shall then supply the information required in this subsection to the claimant within 30 days of receipt of such request.

*Id.* at 3. Raymond found this description of Ilias's injuries to be uninformative because in his experience injury descriptions in police reports are often inaccurate. Dkt. 31-9 at 36. Because of this and the potential for multiple injury claims of others in the wreck, Raymond believed further investigation into the injuries of all those involved in the accident was warranted. Dkt. 35 at 18.

Furman and Raymond spoke once more on August 22nd. *Id.* at 23. During the call, Raymond accepted liability for Ilias's property damage claim. *Id.* Raymond retired from USAA at the end of the month and transferred the claim to adjustor Don Johnson. Dkt. 31-9 at 5.

Johnson took over the claim after the Labor Day holiday, on September 6th. Dkt. 31-10 at 38; Dkt. 35 at 25. He reviewed the claim file and scheduled an inspection of Ilias's vehicle. Johnson then called Furman and left a message with her office confirming the date for the vehicle inspection. Dkt. 35 at 26.

The next week, USAA inspected Ilias's vehicle and declared it a total loss. *Id.* at 30; Dkt. 42-7. A few days after the vehicle inspection, on September 15th, Furman and Johnson spoke over the phone to discuss Ilias's injuries and treatment status. Dkt. 31-10 at 27; Dkt. 35 at 32. Furman confirmed that Ilias had been hospitalized for a few days following the accident and had suffered multiple broken bones. *Id.* Because this description of Ilias's injuries aligned with the description provided by Ilias's prior attorney, Johnson tendered the policy limits as

6

an offer to settle Ilias's injury claim. *Id.* The $10,000 policy limits tender came 48 days after the accident.[3]

After tendering the offer, Johnson sent two letters to Furman. The first letter enclosed a copy of the declarations page from Dunbar's policy and promised to send a coverage disclosure as outlined by the statute in a separate letter. The second letter enclosed a check for $10,000 and a general release from liability. Dkt. 31-10 at 30–32. Johnson believes, but cannot confirm, that he sent the cover disclosure with the second letter. *Id.* at 32. But Furman denies receiving the disclosure.[4] Dkt. 31-3 at 40–41.

Furman did not respond to USAA's full tender of September 15th. Dkt. 31-10 at 33. On October 9, 2017, Furman filed a personal injury lawsuit on Ilias's

---

[3] This timeframe should be reduced by about 10 days to account for the time Ilias spent in the ICU and was either in a medically induced coma or heavily medicated. During this time, Ilias stated he was not aware of the extent of his injuries, and he was in no condition to consider a settlement offer. Dkt. 31-16 at 16.

[4] At his deposition, Johnson testified that USAA uses a standardized statement of liability insurance form to comply with the Fla. Stat. § 627.4137 disclosure requirement. Dkt. 31-10 at 23; *see, e.g.*, Dkt. 31-18 at 2. The standard form lists for each known policy the available coverage limits, the dates of the policy period, who is insured under the policy, whether there is an umbrella or excess policy, and if there are coverage issues or defenses. *Id.* Johnson stated the typical practice was for the adjustor to complete the form and send it to a manager for signature. The manager would then mail or fax the signed disclosure to the claimant or claimant's attorney. Dkt. 31-10 at 23. USAA's records show that Johnson completed a disclosure form for Furman, but Johnson cannot recall, and USAA's records do not show, that the form was signed by a claims manager or that it was mailed or faxed to Furman. *Id.* at 30–32.

behalf against Dunbar in Florida state court.[5] Dkt. 42 at 12. Johnson learned of the lawsuit when USAA was served with the complaint. Dkt. 31-10 at 33; Dkt. 35 at 35. Johnson then called Furman to confirm that she was rejecting USAA's tender of the policy limits. Dkt. 35 at 35–36. Furman confirmed that she was rejecting the settlement offer and stated that she had filed suit because she needed to depose Dunbar and Brignoni to rule out the possibility that either of them had other insurance coverage. *Id.* at 36; Dkt. 31-10 at 33.

Two months later, Furman deposed Dunbar and verified he had no insurance coverage beyond his USAA policy. Dkt. 31-3 at 75–76. The case proceeded to trial and a jury found Dunbar liable for Ilias's injuries. Dkt. 1-3 at 69–70. Final judgment was entered for Ilias in the amount of $5,230,559.44. *Id.* at 71.

After the final judgment, Ilias sued USAA in Florida state court, alleging that USAA acted in bad faith in handling Ilias's claim against its insured. Dkt. 1-3. USAA removed the case to this Court based on diversity jurisdiction and now moves for summary judgment.

---

[5] Between USAA's tender and the filing of the lawsuit, Furman spoke with USAA adjustors about Ilias's property damage claim for his vehicle. But Furman did not speak with anyone about Ilias's injury claim. Dkt. 35 at 34–35; Dkt. 42-5 at 12–13.

## II. LEGAL STANDARDS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

When deciding whether a reasonable jury could return such a verdict, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is inappropriate for the Court to make credibility determinations or weigh the evidence at the summary judgment stage. *Anderson*, 477 U.S. at 255. But where the non-movant relies on implausible inferences drawn from the evidence, summary judgment is appropriate. *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 970 (11th Cir. 2002). Likewise, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B. Florida Law on Bad Faith

In Florida, an insurer owes a duty of good faith to its insureds in handling their claims. *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 6 (Fla. 2018). Florida law allows an insured to sue its insurer for breaching its duty of good faith. *See* Fla. Stat. § 624.155; *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 546 (Fla. 2012). Florida case law also allows a third-party claimant—here, Ilias—to step into the shoes of the insured and sue an insurer directly for its bad faith in failing to settle a claim on behalf of its insured. *See Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980); *Thompson v. Com. Union Ins. Co. of New York*, 250 So. 2d 259, 264 (Fla. 1971) (holding that "a judgment creditor may maintain suit directly against a tortfeasor's liability insurer for recovery of the judgment in excess of the policy limits, based upon . . . bad faith of the insurer in the conduct or handling of the suit").

The duty of good faith requires the insurer to exercise "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Harvey*, 259 So. 3d at 6 (cleaned up). Among other things, the insurer is obligated "to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same." *Id.* at 6–7. The insurer must also "investigate the facts . . . and

settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.* at 7. In instances "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991).

Whether an insurer has breached its duty of good faith is determined under the "totality of the circumstances." *Harvey*, 259 So. 3d at 7. "[T]he critical inquiry in a bad faith [action] is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Id.* In the context of an insurer's failure to settle, the issue is "whether, under all of the circumstances, the insurer could and should have settled the claim within the policy limits had it acted fairly and honestly toward its insured and with due regard for his interests." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 679 (Fla. 2004).

Along with establishing that the insurer breached its duty, a valid bad-faith claim requires "a causal connection between the damages claimed and the insurer's bad faith." *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 902 (Fla. 2010). In other words, the insurer's bad faith must cause the excess judgment against its insured. *See Harvey*, 259 So. 3d at 11–12.

Whether an insurer acted in bad faith and whether that bad faith caused the damages claimed are factual questions typically left for a jury to resolve. *See Berges*, 896 So. 2d at 672–73. But "courts applying Florida law have granted summary judgment if the undisputed facts would not allow any reasonable jury to conclude the defendant breached its duty of good faith." *Martin v. Allstate Prop. & Cas. Ins. Co.*, 794 F. App'x 883, 887 (11th Cir. 2019); *see, e.g.*, *Eres v. Progressive Am. Ins. Co.*, No. 20-11006, 2021 WL 2197391, at *6 (11th Cir. June 1, 2021); *Mesa v. Clarendon Nat. Ins. Co.*, 799 F.3d 1353, 1360 (11th Cir. 2015) (both cases affirming summary judgment for insurer on third-party bad-faith claims).

**III. ANALYSIS**

A bad-faith inquiry typically takes a broad view of all the circumstances. But here the inquiry is more constrained. In her deposition, Furman stated that she did not accept the policy limits once tendered because USAA failed to provide an insurance disclosure that addressed her requests for coverage information and complied with the statutory disclosure requirements. Dkt. 31-3 at 63, 67. Specifically, USAA did not confirm or deny whether Dunbar had an umbrella policy or other coverage as a source available to compensate Ilias for his injuries. *Id.* at 52–54. Had USAA provided this information when it tendered the policy limits, Furman claimed that, regardless of the other shortcomings with USAA's

claims handling, she would have accepted the policy limits and Ilias would have agreed to settle his claim, thereby avoiding the excess judgment. *Id.* at 63, 67.

Based on Furman's statements, a verdict in Ilias's favor would require a jury to find (1) that USAA's failure to send its standardized disclosure form constituted bad faith and (2) that this failure was the reason Ilias's catastrophic claim did not settle within the $10,000 limits of Dunbar's policy. USAA argues that it is entitled to summary judgment because it did not act in bad faith as a matter of law and its actions did not cause the excess verdict against its insured. The Court agrees with USAA on both points.

### A. No Reasonable Jury Could Conclude that USAA Acted in Bad Faith.

On the evidence presented, a reasonable jury could not find that USAA acted in bad faith. USAA diligently tried to settle Ilias's claim. It promptly responded to Furman's request the day it was sent. Raymond provided Furman with a declarations page that confirmed Dunbar's $10,000 bodily liability limit and provided a sworn copy of the policy days later. These items supplied almost all of the information Furman requested, except for available defenses to coverage—which did not exist and USAA did not intend to create—and information for other available coverages—which Dunbar had not provided to USAA and was "none." Johnson then tendered the policy limits once he confirmed Ilias's injuries. Johnson also completed USAA's standard disclosure form that provided direct responses to

Furman's requests. The only possible misstep in this process was Johnson's failure to mail the form, or at least USAA cannot confirm it was sent to Furman, and Furman claims she never received it. Dkt. 31-3 at 40–41.

Assuming that USAA indeed failed to send the disclosure form, this was evidence of some negligence on its part—but nothing more and with little prejudice to Furman. While negligence is relevant to the bad-faith inquiry—"negligence is not the standard." *Harvey*, 259 So. 3d at 9. "[A] cause of action based solely on negligence which does not rise to the level of bad faith does not lie." *DeLaune v. Liberty Mut. Ins. Co.*, 314 So. 2d 601, 603 (Fla. 4th DCA 1975). The failure to mail the disclosure form "demonstrates at best a need for [USAA] to augment its claims practices, not that [USAA's] actions rose to the level of bad faith." *Mesa*, 799 F.3d at 1360 (affirming summary judgment and finding insurer's negligence in failing to advise its insured of settlement opportunities did not equate to bad faith). Indeed, the Eleventh Circuit has held that a similar failure to provide a disclosure confirming or denying other coverage was simple negligence that did not rise to the level of bad faith—even when (unlike here) the insurer possessed the requested information.[6] *E.g.*, *Kwiatkowski v. Allstate Ins. Co.*, 717 F. App'x 910, 912 (11th Cir. 2017).

---

[6] Furman's contention that Fla. Stat § 627.4137 required USAA to make some affirmation that Dunbar had no umbrella or excess coverage does not comport with the statutory text. The statute requires an insured or his insurance agent to disclose "each known insurer." Here, USAA had

Citing the Florida Supreme Court's decision in *Harvey*, Ilias notes that evidence of negligence is relevant to the bad-faith inquiry. Dkt. 41 at 7 (citing *Harvey*, 259 So. 3d at 9). Because such evidence is relevant, Ilias seems to suggest that evidence of an insurer's negligence can support a verdict that an insurer acted in bad faith. In other words, Ilias seems to imply that *Harvey* adopted a negligence standard for liability in bad-faith actions. The Court disagrees. While *Harvey* does instruct that negligence is relevant to determining bad faith and perhaps "muddie[d] the waters between negligence and bad faith," *Harvey*, 259 So. 3d at 13 (Canady, C.J., dissenting), *Harvey* plainly states that "negligence is not the standard" for liability in a bad-faith action, *see id.* at 9. *Harvey* thus reaffirmed longstanding Florida precedent that requires a plaintiff in a bad-faith action to prove that an insurer's actions surpassed mere negligence.[7] *See Auto Mut. Indem. Co. v. Shaw*, 184 So. 852, 859 (Fla. 1938); *Campbell v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530 (Fla. 1974) (explaining that the "standard[ ] for determining liability in an excess judgment case is bad faith rather than negligence"). So

---

reached out to Dunbar for this information, but he did not respond. Dkt. 42-4. So at the time of tender, USAA did not know of any policies aside from its own auto liability policy, and indeed there were no other policies, which Furman confirmed after deposing Dunbar. Dkt. 31-3 at 76–77. Likewise, there were no policy coverage defenses to disclose.

[7] The Eleventh Circuit also understands Florida's bad-faith standard to require evidence that an insurer's actions must surpass mere negligence. *See, e.g.*, *Eres*, 2021 WL 2197391, at *5 (affirming summary judgment on finding that insurer's actions "at worst . . . show[ed] some negligence—but nothing approaching bad faith"); *see also Mesa*, 799 F.3d at 1359–60.

USAA's actions, though potentially negligent to some degree, did not rise to the level of bad faith.

### B. No Reasonable Jury Could Find that USAA Caused the Excess Verdict against Its Insured.

USAA also was not the cause of the excess verdict. Though Furman testified that she would have settled Ilias's injury claim had she received a proper disclosure, her actions suggest otherwise. Her actions suggest a "bad faith setup," which the Florida law of third-party bad faith seems to encourage in cases like this of great damages but small insurance. Furman never gave any outward indication that she was interested in accepting the policy limits or settling at all. She never made a settlement demand; her initial representation letter was a notice of representation and request for information. She also never discussed with Ilias the possibility of settling for the $10,000 policy limits, though Ilias said he would have followed Furman's advice had she instructed him to settle his claim. Dkt. 31-16 at 9–10, 15–16. Furman never asked USAA to supplement its initial response to her requests—although she followed up with Brignoni's insurer when it failed to provide a coverage affidavit. Furman also did not notify USAA when she did not receive the disclosure form USAA promised to send in the September 15th letter. Only after Furman rejected USAA's tender and sued Dunbar did she mention that she still needed to confirm whether Dunbar had an umbrella policy. And after deposing Dunbar and confirming he had no other insurance coverage, Furman did

not agree to settle. She instead took the case to trial and recovered a judgment for more than 500 times the policy limits.

Testimony, even self-serving testimony, can be evidence sufficient to avoid summary judgment. *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (noting a "litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment"). But the Court need not accept testimony that is blatantly contradicted by the record—as is the case here. *See Scott*, 550 U.S. at 380.

The practicalities of personal-injury litigation show that this $10,000 tender (made 48 days after the multi-car, multi-injury accident) would never settle Ilias's catastrophic case. In any recovery, Ilias's healthcare liens alone would be *massive*, and in the normal course healthcare liens would easily engulf way more than this $10,000 amount.

Regrettably, the Florida common law of third-party bad faith encourages costly lawsuits, like the instant one. One cannot fault Ilias's counsel—her client was badly injured, and Dunbar was underinsured. She is seeking as great a recovery for him as the legal theories permit. But to contend that a $10,000 tender issue caused this $5 million-plus jury verdict—and would have prevented it had USAA acted slightly differently—is not plausible to any realistic Florida personal injury lawyer.

The undisputed evidence establishes that Furman never made a demand for the policy limits; never expressed to USAA that she intended to settle; never followed up with USAA when she did not receive information about possible (nonexistent) umbrella coverage; and did not settle after confirming Dunbar had no coverage beyond his USAA policy. Considering all this, no reasonable jury could conclude that Ilias's injury claim would have settled had USAA properly executed and mailed the coverage form Furman requested.

## IV. CONCLUSION

There is no genuine dispute as to material fact: USAA's actions did not constitute bad faith and did not cause the excess verdict against its insured. USAA's Motion for Summary Judgment is therefore **GRANTED**.

**DONE AND ORDERED** at Tampa, Florida, on June 24, 2021.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record